IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **JERRY WHISENHUNT, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 1:23-00443-KD-B** |
| | ) | |
| **AMERACAT, INC., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This matter is before the Court on Defendant Ameracat, Inc.'s ("Ameracat") Renewed Motion to Compel Arbitration and Stay Action, (Doc. 35),[1] Plaintiffs Jerry Whisenhunt ("Mr. Whisenhunt"), Angela Whisenhunt, and Minutes of Use, LLC's ("Minutes of Use") (collectively "Plaintiffs") Response, (Doc. 38), Ameracat's Reply, (Doc. 39), and Defendant Markel American Insurance Company's ("MAIC") Response to Ameracat's original motion, (Doc. 19).[2]

Upon consideration and for the reasons set forth herein, it is **ORDERED** that Ameracat's Renewed Motion to Compel Arbitration and Stay Action, (Doc. 35), is **GRANTED** and that the proceedings between Plaintiffs and Ameracat are hereby **STAYED** pending resolution of these claims in accordance with the Arbitration Agreement. It is further **ORDERED** that the proceedings between Plaintiffs and MAIC are **STAYED** pending completion of the arbitration proceedings between Plaintiffs and Ameracat.

---

[1] Ameracat renewed its prior Motion to Compel Arbitration and Stay Action, (Doc. 9), in response to Plaintiffs' Amended Complaint, (Doc. 26). As such, Ameracat's prior Motion to Compel Arbitration and Stay Action, (Doc. 9), is **DENIED** as moot.

[2] Also before the Court are MAIC's Second Motion for Judgment on the Pleadings, (Doc. 30), and brief in support thereof, (Doc. 31). MAIC filed its Second Motion in response to Plaintiffs' Amended Complaint, (Doc. 26). Accordingly, MAIC's prior Motion for Judgment on the Pleadings, (Doc. 11), is **DENIED** as moot.

## I.      BACKGROUND

Mr. Whisenhunt is a licensed charter boat fishing captain who owns and charters several fishing vessels out of Dauphin Island and Gulf Shores, Alabama. (Doc. 26 at 3). Mr. Whisenhunt owns 100% of Minutes of Use, through which he operates his commercial chartering business. (Id. at 1, 3). Ameracat is a fiberglass boat manufacturer that designs and manufactures commercial and recreational offshore fishing catamarans out of its headquarters in Fort Pierce, Florida. (Doc. 35 at 2). Per the Amended Complaint, Mr. Whisenhunt was interested in expanding his fleet with a new charter boat and contacted Ameracat's principal owner and president Scott Meitner ("Mr. Meitner"). (Doc. 26 at 3). Mr. Whisenhunt alleges that he contracted for the purchase of a new 31-foot Ameracat, for which he made a $10,000 deposit. (Id.). In an affidavit, Mr. Whisenhunt testifies that he told Mr. Meitner that he was a professional charter boat captain on the Alabama Gulf Coast and needed to charter her in the recreational fishing trade. (Doc. 17-1 at 2).

 On or about December 6, 2021, Mr. Whisenhunt visited the Ameracat plant in Fort Pierce and noticed a new Ameracat 39-foot model under construction (the "Vessel"). (Doc. 26 at 3). While discussing terms of the warranty on the Vessel, Mr. Meitner apparently stated, "the boat has a 10-year warranty on the hull, but you won't need it." (Doc. 17-1 at 3). Mr. Meitner purportedly did not show him or mention the existence of any *written* warranty or limitations on the warranty, and Whisenhunt claims that the alleged oral warranty was an important factor in his decision to buy the Vessel. (Id.). Mr. Whisenhunt also testifies that it was very important to him that Ameracat could finish and deliver the Vessel before the Alabama snapper season began on June 1, 2022, and that he subsequently accepted the contract to purchase the Vessel inclusive of a 10-year hull warranty and with a promised June 1 delivery date. (Id. at 3-4); (see Doc. 1-1)

(January 18, 2022, email from Mr. Meitner to Mr. Whisenhunt regarding terms on purchasing the Vessel). Mr. Whisenhunt says that on January 31 and February 1, 2022, he wired Ameracat $279,350 toward the total contract price of $394,850. (Doc. 17-1 at 4); (see Doc. 1-2) (January 18, 2022, invoice showing total purchase price and balance due). "Ameracat failed to deliver the boat on June 1, 2022, but promised to deliver her by June 30. Ameracat failed to complete the Vessel by June 30 and by an ever-slipping series of later promised deliver dates for the next eleven months." (Doc. 17-1 at 4).

Finally, Mr. Meitner promised that the Vessel would be completed and ready for delivery on May 20, 2023, and two days later, Mr. Whisenhunt and one of his employees drove to Fort Pierce to pick it up. (Id. at 5). Notwithstanding that "several necessary construction details" were still incomplete, Whisenhunt was delivered the title document on May 22. (Id.); (Doc. 1-3) ("Manufacturer's Certificate of Origin for a Vessel"). He claims that Ameracat finished the Vessel on May 25, and that right before he drove off with the Vessel in tow, Mr. Meitner asked him to come to the office for "some paperwork." During this time, Mr. Whisenhunt signed the "Ameracat, Inc. Ten Year Limited Hull Warranty" ("Limited Warranty"), (Doc. 9-1), and admits to not reading it. (Doc. 17-1 at 6). He now avers that Mr. Meitner intentionally hid from him the terms of the warranty before and after he accepted the contract on January 31, 2022, the "obvious purpose" of which was to induce him into buying the Vessel. (Id. at 7). Meanwhile, Mr. Meitner denies that he promised Plaintiffs an unlimited hull warranty on the Vessel and that such is not and never has been Ameracat's regular business practice. (Doc. 25 at 9-10). He testifies that the Limited Warranty is its standard warranty, and that Mr. Whisenhunt never asked him to see the Limited Warranty nor ask about its specific terms. (Id. at 10). Relevant to this Order, the Limited Warranty contains an arbitration provision (the "Arbitration Agreement"). (Doc. 9-1 at 2).

Mr. Whisenhunt declares that he was operating the Vessel in the Gulf of Mexico in one-two foot waves about 40 miles offshore on July 7, 2023, on a fishing trip with several friends who were also charter captains. (Doc. 26 at 8). "When the Vessel suddenly and inexplicably began to operate sluggishly, Whisenhunt and the crew discovered seawater entering the Vessel through underwater holes in the hull and threatening to sink her. He and his crew were able to navigate the Vessel slowly back to Dauphin Island to take her out of the water onto her trailer. To prevent the Vessel from sinking during the trip, Whisenhunt was required to trim her so low at the stern that the three new Suzuki outboard engines were contaminated with salt water and damaged." (Id.). On July 20 and August 4, surveyors representing Whisenhunt and MAIC supposedly inspected the Vessel and found that the fiberglass laminate, which was "resin-starved and visibly shiny," peeled off, "causing a severe hull failure that enabled seawater to enter the hulls." (Id.). Plaintiffs allege that the surveyors found no evidence that the Vessel had struck a submerged object. (Id.). Meanwhile, Mr. Meitner testifies that shortly after the July 7 incident, he travelled to Dauphin Island to preliminarily inspect the Vessel and "determined that the hull damage was consistent with and likely caused in the first instance by the Vessel striking an external object or from some other external force causing the hull damage." (Doc. 39-1 at 2). On September 5, 2023, Whisenhunt's counsel sent Meitner a letter purporting to revoke acceptance of the Vessel and demanding prompt repayment of its entire purchase price, as well as almost $195,000 in incidental and consequential damages. (Doc. 1-8).

MAIC issued a marine insurance policy to Minutes of Use and Whisenhunt that insures the Vessel. (Doc. 19 at 1; Doc. 26 at 2). Plaintiffs allege that MAIC owes coverage for the Vessel's July 7 casualty, (Doc. 26 at 7-9), but MAIC denied coverage on the insurance claim based on,

4

*inter alia*, a policy exclusion for loss or damage from latent or manufacturing defects, (Doc. 19 at 1).

Plaintiffs initiated litigation in this Court on November 21, 2023. (Doc. 1). The Amended Complaint brings seven claims: "Breach of Contract for Delayed Delivery of Vessel" (Count One), "Repayment of Purchase Price, Incidental and Consequential Damages Following Revocation of Sale" (Count Two), "Breach of Implied Warranty of Merchantability" (Count Three), and "Breach of Implied Warranty of Fitness for a Particular Purpose" (Count Four) against Ameracat; "Promissory Fraud" (Count Five) against Mr. Meitner; and "Breach of Contract of Insurance by Markel" (Count Six) and "Breach of Duty of Good Faith by Markel in Denying Insurance Coverage" (Count Seven) against MAIC. (Doc. 26 at 11-14). In response to the Amended Complaint, Ameracat renews its prior motion to compel arbitration and moves the Court to compel arbitration of all "arbitrable" claims and stay all claims pending the outcome of arbitration. (Doc. 35). MAIC does not oppose compelling arbitration of Plaintiffs' claims against Ameracat but asks for a stay of all claims, including those against MAIC, in the meantime. (Doc. 19).

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides, "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. A party seeking to enforce a written arbitration agreement may

petition a federal district court that would otherwise have subject matter jurisdiction over a civil action between the parties for an order directing that arbitration proceed in the manner provided for in the agreement. § 4. Upon hearing the parties and "being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," the court shall order that the parties arbitrate in accordance with the agreement's terms. Id. "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." Id.

Assuming that the litigated issue is properly referable to arbitration, the district court shall on application of one of the parties stay trial proceedings pending the outcome of arbitration. § 3. "The role of the courts is to 'rigorously enforce agreements to arbitrate.'" Hemispherx Biopharma, Inc. v. Johannesburg Consol. Investments, 553 F.3d 1351, 1366 (11th Cir. 2008) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Still, a district court may only compel arbitration of those disputes that the parties have agreed to submit. Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 302 (2010) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)).

District courts are to undertake a two-step inquiry when considering a motion to compel arbitration: (1) assess whether the parties agreed to arbitrate that dispute by referencing the federal substantive law of arbitrability, applicable to any arbitration agreement within the FAA's coverage; and (2) consider whether legal constraints external to the agreement foreclose arbitration. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626-28 (1985); Patriot Mfg., Inc. v. Dixon, 399 F. Supp. 2d 1298, 1300-01 (S.D. Ala. 2005). With

6

respect to the first prong, to determine whether the parties agreed to arbitrate a particular dispute,

courts consider: (1) whether there is a valid arbitration agreement; and (2) whether the dispute at

bar falls within the scope of the arbitration agreement. Dixon, 399 F. Supp. 2d at 1301; see also

Shores of Pan., Inc. v. Safeco Ins. Co. of Am., No. 07-CV-00602-KD-B, 2008 WL 4417558, at

*4 (S.D. Ala. Sep. 29, 2008). "To resolve these questions, courts apply state law principles

relating to ordinary contract formation and interpretation, construed through the lens of the

federal policy favoring arbitration." Dixon, 399 F. Supp. 2d at 1301.

The Court may consider evidence outside of the pleadings for purposes of a motion to

compel arbitration. Chambers v. Groome Transp. of Ala., 41 F. Supp. 3d 1327, 1334 (M.D. Ala.

2014). Courts in the Eleventh Circuit resolve motions to compel arbitration under a summary-

judgment-like standard. Johnson v. KeyBank Nat'l Ass'n, 754 F.3d 1290, 1294 (11th Cir. 2014)

(noting the "summary-judgment-like nature of an order compelling arbitration, which is in effect

a summary disposition of the issue of whether or not there has been a meeting of the minds on

the agreement to arbitrate") (internal quotations and citations omitted). A district court may

conclude as a matter of law that the parties entered into an arbitration agreement only if "there is

no genuine dispute as to any material fact" concerning the formation of the agreement. Bazemore

v. Jefferson Cap. Sys., LLC, 827 F.3d 1325, 1333 (11th Cir. 2016) (citing Fed. R. Civ. P. 56(a)).

### III.    ANALYSIS

### A.  Florida Substantive Law Applies to Determine Whether the Limited Warranty is Part of the Contract Between the Parties

Plaintiffs contend that the record reveals several disputes of material fact as to whether the

parties agreed to arbitrate that are "fatal to a pretrial motion to stay." (Doc. 38 at 3). The first step

in considering the arbitrability of any contract containing an arbitration clause is for the Court to

resolve any formation challenge to the contract containing the arbitration clause. Solymar Invs.,

Ltd. v. Banco Santander S.A., 672 F.3d 981, 991 (11th Cir. 2012); Granite Rock, 561 U.S. at 296

("[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to

decide."). Determining whether a contract exists between the parties is governed by state law.

Solymar Invs., 672 F.3d at 991. While the parties do not expressly dispute which state's law

applies, they cite cases from state and federal courts in both Florida and Alabama in their

briefing. (See Docs. 35, 38).

   In diversity-of-citizenship cases, the choice-of-law rules of the forum state determine which

state's substantive law governs. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). In

Alabama, the doctrine of *lex loci contractus* governs the validity, interpretation, and construction

of the contract. Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co., 358 F.3d 1306, 1308

(11th Cir. 2004). This states that "a contract is governed by the laws of the state where it is made

except where the parties have legally contracted with reference to the laws of another

jurisdiction."[3] Cherry, 582 So. 2d at 506.

---

[3] Here, the Arbitration Agreement reads, "Venue for any arbitration or legal action shall be Fort Pierce, Florida, and Florida law shall be used for purposes of interpretation and construction of this limited warranty." (Doc. 9-1 at 2). "Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement." Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991). This means that under Alabama's choice-of-law principles, which apply here, the district court is to "first look to the contract to determine whether the parties have specified a particular sovereign's law to govern." Stovall v. Universal Const. Co., Inc., 893 So. 2d 1090, 1102 (Ala. 2004). That state's law then controls unless it is contrary to the forum state's fundamental public policy. Id. With the Limited Warranty containing a Florida choice-of-law provision, (see Doc. 9-1 at 2), and no indication of contrary public policy between Florida and Alabama state law at issue, ordinarily that would be the end of the matter; Florida law would "be used for purposes of interpretation and construction of this limited warranty," (Doc. 9-1 at 2). However, that is complicated by Plaintiffs' assertion that the Limited Warranty does not apply in the first place. (See Doc. 38). As the Northern District of Illinois explained, "[A]s an antecedent matter, the court must determine whether the parties have a valid contract, and before it can do that, it must decide which state's law applies to the issue of contract formation. Only if the court finds a valid contract may it turn to the choice of law provision in the [a]greement in order to determine the validity of the arbitration provision." Kaufman v. Am. Express Travel Related Servs. Co., Inc., No. 07-CV-1707, 2008 WL 687224, at *3 (N.D. Ill. Mar. 7, 2008); Fridman v. 1-800 Contacts, Inc., 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."). To avoid putting the cart before the horse, the district court should revert to the choice-of-law doctrine of the forum state to determine which state's law applies to the issue of contract formation.

Here, the parties do not dispute that Mr. Whisenhunt signed the Limited Warranty at Ameracat's plant in Fort Pierce, Florida. (Doc. 17-1 at 6) (Mr. Whisenhunt's affidavit stating that he signed and dated both copies of the Limited Warranty before departing with the Vessel from Ameracat's Fort Pierce Plant). As such, this Court is to apply the Florida substantive law of contracts to determine whether the Limited Warranty, which includes the Arbitration Agreement, is a part of the contract between the parties. See Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc., 363 F.3d 1089, 1092-93 (11th Cir. 2004) (explaining that under the doctrine of *lex loci contractus*, the laws of the jurisdiction where the contract was executed, which requires determining where the offeree communicated acceptance to the offeror, governs interpretation of the substantive issues regarding the contract).

## B. Tbe Parol Evidence Rule Bars Admitting Evidence of an Alleged Prior Oral Warranty Agreement to Contradict the Limited Warranty's Express Terms

Article II of the Uniform Commercial Code (UCC), adopted in Florida, governs transactions for the sale of goods. See Fla. Stat. § 672.102. "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action." § 672.105(1). As the "predominant factor" or "thrust" of this contract is unquestionably a contract for the sale of the Vessel at issue, the UCC applies. See Allied Shelving & Equip., Inc. v. Nat'l Deli, LLC, 154 So. 3d 482, 484 (Fla. Dist. Ct. App. 2015) ("Whether the UCC or the common law applies to a particular hybrid contract depends on whether the predominant factor, the thrust, the purpose of the contract, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." (cleaned up).

The parol evidence rule is a rule of substantive law, not of evidence. MCC-Marble
Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A., 144 F.3d 12384, 1388-89 (11th Cir.
1998). As such, it must be applied by a federal court sitting in diversity. Johnson Enters. of
Jacksonville, Inc. v. FPL Grp., Inc., 162 F.3d 1290, 1309 n.47 (11th Cir. 1998). Per the UCC's
parol evidence rule, terms in a writing intended by the parties as a final expression of their
agreement may not be contradicted by evidence of any prior agreement or of a contemporaneous
oral agreement. § 672.202. "The parol evidence rule serves as a shield to protect a valid,
complete and unambiguous written instrument from any verbal assault that would contradict, add
to, or subtract from it, or affect its construction." Sears v. James Talcott, Inc., 174 So. 2d 776,
778 (Fla. Dist. Ct. App. 1965). In other words, it applies when the written agreement "represents
the complete and exclusive instrument setting forth the parties' intended agreement." Jenkins v.
Eckerd Corp., 913 So. 2d 43, 53 (Fla. Dist. Ct. App. 2005) (emphasis added) (describing such
written agreements as "integrated"). A merger clause can function as an indicator of such intent.
Johnson Enters., 162 F.3d at 1309. Here, the Limited Warranty states,

> THIS WARRANTY, AND THE RIGHTS AND REMEDIES UNDER IT, IS
> EXCLUSIVE AND IS GIVEN IN PLACE OF ALL OTHER WARRANTIES,
> WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF
> MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, WHETHER
> ARISING BY LAW, CUSTOM, CONDUCT OR USAGE OF TRADE. . . .
>
> This limited warranty contains the entire agreement between Ameracat, Inc. and
> Purchaser and supersedes all prior agreements, discussions, negotiations, commitments,
> and representations, whether oral or written, between them regarding Ameracat, Inc.
> warranty.

(Doc. 9-1 at 1-2) (the "Merger Clause") (emphasis added). Since the Limited Warranty states that
it is "exclusive and given in place of all other warranties" and "contains the entire agreement
between Ameracat, Inc. and [Mr. Whisenhunt] and supersedes all prior agreements, discussions,
negotiations, commitments, and representations, whether oral or written," it undoubtedly

contains a merger clause. <u>See Jenkins</u>, 913 So. 2d at 53 n.1 ("A merger or integration clause is 'a contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract.'") (quoting Black's Law Dictionary, 813 (7th ed. 1999)).

While a merger clause does not per se establish a totally integrated agreement, it is a highly persuasive statement of total integration that generally works to prevent a party from introducing parol evidence to vary or contradict the agreement's written terms. <u>Jenkins</u>, 913 So. 2d at 53; <u>Johnson Enters.</u>, 162 F.3d at 1309 ("When a contract contains such a merger clause, the agreement is deemed to be 'integrated,' such that evidence of prior or contemporaneous agreements shall not be admitted to contradict the terms of the contract.").

Notwithstanding the general rule, parol evidence may be admitted showing that a prior oral agreement induced the signing of the written contract. <u>Johnson Enters.</u>, 162 F.3d at 1309. Under the "inducement" exception to the parol evidence rule, "parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change, or reform the instrument." <u>Id.</u> at 1309-10 (quoting <u>Mallard v. Ewing</u>, 164 So. 674, 678 (Fla. 1936)). However, the party aiming to submit parol evidence under this exception carries a heavy burden of proof. <u>Ungerleider v. Gordon</u>, 214 F.3d 1279, 1282 (11th Cir. 2000). He must prove the prior agreement's existence "by evidence that is <u>clear, precise, and indubitable</u>; that it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testify, and that they narrate the details exactly and that their statements are true." <u>Mallard</u>, 164 So. at 678 (emphasis added). Critically, the Eleventh Circuit has held that when the existence of the contemporaneous oral agreement "rests solely on a credibility choice between two witnesses," such evidence of the oral agreement is insufficient to satisfy <u>Mallard</u>'s

strictures. <u>Chase Manhattan Bank v. Rood</u>, 698 F.2d 435, 438 n.4 (11th Cir. 1983); <u>Johnson</u>

<u>Enters.</u>, 162 F.3d at 1310 (same). In other words, this evidence on its own is not enough to

trigger application of the inducement exception. <u>Rood</u>, 698 F.2d at 438.

     Here, the Limited Warranty's Merger Clause prompts application of the parol evidence

rule to bar admitting Mr. Whisenhunt's affidavit to contradict the Limited Warranty's express

terms. While Mr. Whisenhunt asserts that the supposed unlimited warranty "was an important

factor in [his decision] to buy the 39-footer," (Doc. 17-1 at 3), given Mr. Meitner's declaration to

the contrary,[4] this evidence is insufficient under Florida law to meet Plaintiffs' burden for

invoking the inducement exception to the parol evidence rule. <u>See Rood</u>, 698 F.2d at 438 n.4

("We do not mean to imply that Rood's testimony necessarily lacked credibility. Rather, we do

not believe that, when the existence of the contemporaneous oral agreement rests solely on a

credibility choice between two witnesses, the proof of that accord is 'clear, precise, and

indubitable.'") (citing <u>Mallard</u>, 164 So. at 678)). As such, this Court disregards the contents of

Mr. Whisenhunt's affidavit, (Doc. 17-1), which are offered to contradict the Limited Warranty's

terms via inadmissible parol evidence.[5]

     Accordingly, Florida cases holding that a provision imposing material limitations on the

rights of a party to a sale contract is not effective unless it was part of the basis of the bargain

between the parties when the contract was entered are inapposite. <u>E.g., Knipp v. Weinbaum</u>, 351

So. 2d 1081, 1084-85 (Fla. Dist. Ct. App. 1977) ("The Uniform Commercial Code contemplates

---

[4] Per Mr. Meitner's Declaration, "On behalf of Ameracat, I never promised an unlimited hull warranty on the Vessel to plaintiffs, [Mr. Whisenhunt], Angela Whisenhunt, or Minutes of Use, LLC. It is not and never has been Ameracat's regular business practice to make such a promise or to offer an unlimited hull warranty on any of its products. Ameracat's standard warranty on the vessels it sells is the Limited Hull Warranty." (Doc. 25 at 9-10).
[5] <u>See also Solymar Invs.</u>, 672 F.3d at 992 (holding that the inducement exception to the parol evidence rule under Florida law is inapplicable where the proffered oral testimony directly contradicts an express provision of the written agreement and only applies where a written instrument does not purport to contain the entire agreement between the parties).

that a seller may disclaim warranties as long as the buyer reasonably understands this is being done . . . But a disclaimer, to be effective, must be part of the basis of the bargain between the parties.") and Rehurek v. Chrysler Credit Corp., 262 So. 2d 452, 455 (Fla. Dist. Ct. App. 1972) ("A limitation of warranties to be effective must have been bargained for so that a limitation stated in printed matter given by the seller to the buyer after the sale was completed is not binding . . . .). Plaintiffs overlook that the UCC's stipulations regarding the exclusion or modification of warranties are subject to the parol evidence rule. See § 672.316(1); see also id. cmt. 2 ("The seller is protected under this Article against false allegations of oral warranties by its provisions on parol and extrinsic evidence . . . .").

## C. Ameracat Carries its Burden of Establishing that an Enforceable Arbitration Agreement Exists

It is well-settled that one who signs a contract is generally bound by it. CEFCO v. Odom, 278 So. 3d 347, 351 (Fla. Dist. Ct. App. 2019). Thus, a party to a written contract cannot defend against its enforcement on the sole ground that he signed it without reading it. Id. Indeed, no signature is required to satisfy the FAA's written agreement requirement. BDO Seidman, LLP v. Bee, 970 So. 2d 869, 874 (Fla. Dist. Ct. App. 2007) (citing Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1369 (11th Cir. 2005)). That said, there must be sufficient evidence that the parties agreed to arbitrate. Bee, 970 So. 2d at 874. "The party seeking enforcement of an agreement has the burden of establishing that an enforceable agreement exists." CEFCO, 278 So. 3d at 352. When determining whether an arbitration agreement exists, courts should generally apply ordinary state-law principles governing contract formation. Dasher v. RBC Bank (USA), 745 F.3d 1111, 1116 (11th Cir. 2014). To prove that a contract exists under Florida law, the party seeking its enforcement must prove offer, acceptance, consideration, and sufficient specification of essential terms. CEFCO, 278 So. 3d at 352.

Accordingly, the court may submit to arbitration only those disputes that the parties have agreed to submit. Granite Rock, 561 U.S. at 302; Seifert v. U.S. Home Corp., 750 So. 2d 633, 636 (Fla. 1999) (reasoning that a natural corollary of the rule that the arbitrability of a particular dispute "rests on the intent of the parties" is that "no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate."). Courts must look for evidence that the parties "objectively revealed an intent to submit the dispute to arbitration." Dasher, 745 F.3d at 1116 (quoting First Options, 514 U.S. at 944). The Fourth District Court of Appeal of Florida affirmed the trial court's denial of the appellant's motion to compel arbitration when the appellee had testified that she had never signed the agreement with the arbitration provision and the appellant's contrary evidence was not that the appellee had signed the document but that it was standard practice to require that such agreements be signed. Steve Owren, Inc. v. Connolly, 877 So. 2d 918, 919-20 (Fla. Dist. Ct. App. 2004); see also CEFCO, 278 So. 3d at 354 (finding that when the affiant does not claim to have personal knowledge of whether the plaintiff assented to the arbitration agreement but speaks instead of ordinary practice, his affidavit is not competent evidence that the plaintiff entered into the arbitration agreement). Similarly, the Eleventh Circuit affirmed the denial of the appellant's motion to compel arbitration pursuant to an arbitration clause in the clickwrap agreement[6] when it failed to put forth evidence that the appellee had actually consented to any such terms. Bazemore, 827 F.3d at 1327-28. Appellant's failure to present any competent evidence that the plaintiff entered into any relevant arbitration agreement properly doomed its motion to compel arbitration before the trial court. Id. at 1331.

---

[6] "Clickwrap agreements" are "agreements formed by requiring a computer user to consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with a transaction." Bazemore, 827 F.3d at 1327 (cleaned up).

Here, by contrast, Ameracat submits evidence of the "Ameracat Copy" of the signed Limited Warranty, which includes the Arbitration Agreement, to which Mr. Whisenhunt's signature is clearly affixed. (Doc. 9-1 at 1-2). Also included are Mr. Meitner's declarations that assert that Mr. Whisenhunt signed the Limited Warranty in his presence. (Doc. 9-1 at 3; Doc. 25 at 10). As such, this is not the kind of evidence that Florida courts and the Eleventh Circuit have previously classified as incompetent. See Steve Owren, 877 So. 2d at 919-20; CEFCO, 278 So. 3d at 354; Bazemore, 827 F.3d at 1331. Indeed, Mr. Whisenhunt submits the "Customer Copy" of the signed Limited Warranty. (Doc. 17-1 at 10-11). He also avers that he "signed and dated both copies." (Id. at 6). This is evidence that objectively reveals an intent to submit the dispute to arbitration. See Dasher, 745 F.3d at 1116. After all, "[t]he object of a signature is to show mutuality or assent." Gateway Cable T.V., Inc. v. Vikoa Constr. Corp., 253 So. 2d 461, 463 (Fla. Dist. Ct. App. 1971).

Nor can Mr. Whisenhunt defend against the Arbitration Agreement's enforceability on the sole ground that he failed to read the Limited Warranty before signing it. See CEFCO, 278 So. 3d at 351. "Without evidence to the contrary, the Court must find that the plaintiff assented to the arbitration agreement and that a valid arbitration agreement existed between the parties." Id. at 353 (quoting Buckhalter v. J.C. Penney Corp., Inc., 3:11-CV-752, 2012 WL 44668455, at *3 (S.D. Miss. Sep. 25, 2012)).

Plaintiffs contend that the parties entered the relevant contract in January 2022, 15 months before Mr. Whisenhunt signed the Limited Warranty. (Doc. 38 at 3). Even assuming that the Limited Warranty was a modification of the parties' preexisting contract[7] and that the Limited Warranty is not supported by additional consideration, that would not by itself make the

---

[7] "It is well established that the parties to a contract can discharge or modify the contract, however made or evinced, through a subsequent agreement." St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004).

modification invalid. As the Court held *supra*, the predominant factor of this contract is unquestionably a contract for the sale of the Vessel, meaning the UCC applies. Cf. Fredeking v. Triad Aviation, Inc., 647 F. Supp. 3d 419, 437 (M.D.N.C. 2022) ("[B]ecause the predominant purpose for the contract was provision of services, this court finds that that the contract at issue is a services contract not governed by the UCC."). Agreements modifying contracts governed by UCC Article II need no consideration to be binding. Fla. Stat. § 672.209(1).

### D.  Plaintiffs' Fraud in the Inducement Challenge is for the Arbitrator, Not the Court

"Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 . . . ." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 682 (1996). Under Florida law, "fraud in the factum" occurs "when a legal instrument as actually executed differs from the one intended for execution by the person who executes it, or when the instrument may have had no legal existence." Browning v. Fla. Hometown Democracy, Inc., PAC, 29 So. 3d 1053, 1061 n.4 (Fla. 2010) (citing Black's Law Dictionary, 732 (9th ed. 2009)). On the other hand, "fraud in the inducement" occurs "when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved." Id. The primary difference between these two species of fraud claims is in the parties' understanding of the contract into which they are entering. Solymar Invs., 672 F.3d at 995. "If a party understands the nature of the contract they are executing but contends that there has been some material misrepresentation as to the obligation rising thereunder, only a fraud in the inducement claim will lie." Id. Significantly, when the party contesting arbitration challenges the contract containing the arbitration clause as the result of fraud in the inducement, *it is up to the arbitrator to decide that challenge*. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404-05 (1967). On the other hand, the district court is to decide challenges to

the contract containing the arbitration clause on grounds of fraud in the factum. <u>Solymar</u>, 672 F.3d at 994. Courts are to assess substance over form when discerning the nature of the challenge to the contract. <u>Id.</u> ("[W]e find that a fraud in the inducement claim, though garbed in the trappings of fraud in the factum, is still but a fraud in the inducement claim.").

Mr. Whisenhunt asserts in his affidavit that in 2021, he met with Mr. Meitner and discussed purchasing the 39-foot Vessel in lieu of the 31-footer on which he had already made a deposit. (Doc. 17-1 at 2-3). Mr. Whisenhunt claims that during these discussions, he asked him about the terms of the warranty on the Vessel, to which Mr. Meitner replied that "the boat has a 10-year warranty on the hull, but you won't need it." (<u>Id.</u> at 3). Mr. Meitner allegedly did not show him or mention the existence of any written warranty or limitations thereon, and, per Mr. Whisenhunt, the described warranty was an important factor in his decision to buy the Vessel. (<u>Id.</u>). Mr. Whisenhunt says that he and Mr. Meitner discussed and negotiated details of purchasing the Vessel during December 2021-January 2022, but that during these discussions Mr. Meitner "again did not mention any document that would limit his promise of a 10-year hull warranty." (<u>Id.</u> at 3-4). Mr. Whisenhunt claims to have accepted the contract to purchase the Vessel on January 31, 2021, inclusive of the "10-year hull warranty." (<u>Id.</u> at 4). Mr. Whisenhunt supposedly picked up the Vessel after an "ever-slipping series of later promised delivery dates" on the morning of May 25, 2023, but that right before he drove off with it, Mr. Meitner asked him to come to the office for "some paperwork." (<u>Id.</u> at 4-5). Mr. Whisenhunt describes interaction as follows:

> He handed me two copies of a two-page document that I had never seen before, and which he described as "your 10-year warranty." He told me I would need to sign to get the 10-year warranty. I did not read the document. I signed and dated both copies 05-25-23. It would have been meaningless to read it because as of that time I had no reasonable choice to consider the terms and decide whether to go forward with the contract or not. I put one copy in the glove compartment of my truck and never thought about it again until after the casualty

to the Vessel on July 7, 2023 . . . When I read the document after the casualty, I learned that the [Limited Warranty] was no warranty at all . . . .

(Id. at 5-6).

The Court reads Mr. Whisenhunt's allegations and "promissory fraud" claim, see Count Five of the Amended Complaint, (Doc. 26 at 13-14), as involving a fraud in the inducement challenge. Per the Amended Complaint, "Mietner intentionally made this false promise with the intent to defraud Mr. Whisenhunt by inducing him to enter the Contract." (Id.); (see also Doc. 38 at 5) ("[Mr. Meitner] therefore knew that when he 'informed Mr. Whisenhunt that the Vessel's hull was covered by a 10-year written hull warranty' . . . he was misrepresenting a material fact to Whisenhunt to induce him to enter the contract . . . .") (citing Doc. 25 at 10). Mr. Whisenhunt contends that he accepted the contract to purchase the Vessel, including the "10-year hull warranty," in January 2021. (Doc. 17-1 at 4). Before finally picking it up in May 2023, Mr. Meitner apparently told him that he would need to sign the Limited Warranty to "get the 10-year warranty." (Id. at 5-6). As it would have been "meaningless" to do so since he "had no reasonable choice to consider the terms and decide whether to go forward with the contract or not," Mr. Whisenhunt did not read the Limited Warranty before signing it. (Id. at 6). It seems that Mr. Whisenhunt understood that the "nature of the contract [he] was executing" concerned the warranty on the Vessel, but "contends that there has been some material misrepresentation as to the obligations arising thereunder." Solymar, 672 F.3d at 995; (see also Doc. 17-1 at 6) ("When I read the document after the casualty, I learned that the [Limited Warranty] was no warranty at all, and that if effective it would deprive me completely of the '10 year hull warranty' that Meitner promised me . . . .").

Though Florida case law demarcating the two species of fraud claims is scant,[8] most courts have held that when the plaintiff is given the opportunity to review the contract containing the arbitration agreement, there can be no fraud in the factum, even if the defendant misrepresented the legal effect of signing the document. 1 Litigating Tort Cases § 11:47 (Oct. 2023) (citing Oakwood Mobile Homes, Inc. v. Barger, 773 So. 2d 454, 461 (Ala. 2000) and Haller v. Borror Corp., 552 N.E.2d 207, 210 (Ohio 1990)). Compared to fraud in the inducement, fraud in the factum rarely occurs. 1 Litigating Tort Cases § 11:47. While fraud in the factum may arise when a party signs a document without full knowledge of the instrument's character or essential terms, see Federal Sav. & Loan Ins. Corp. v. Gordy, 928 F.2d 1558, 1565 (11th Cir. 1991), the test of fraud in the factum "is that of excusable ignorance of the contents of the writing signed," Bank of the Ozarks v. Khan, 903 F. Supp. 2d 1370, 1378 (N.D. Ga. 2012). "The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge." Bank of the Ozarks, 903 F. Supp. 2d at 1378.

Mr. Whisenhunt's account does not indicate that he had no reasonable opportunity to read the Limited Warranty or that the failure to do so was excusable under the law. Cf. All Fla. Sur. Co. v. Coker, 88 So. 2d 508, 510 (Fla. 1956) ("A party to a written contract cannot defend against its enforcement on the ground that he signed it without reading it, unless he aver[s] facts showing circumstances which prevented his reading the paper, or was induced by the statement of the other parties to desist from reading it."). The substance of Mr. Whisenhunt's allegations reflects a fraud in the inducement defense. See Solymar, 672 F.3d at 995 ("[T]his case presents the situation where a party understands the nature of the contract but contends there has been some

---

[8] But see Browning, 29 So. 3d at 1061 n.4, and Conlen v. Nat'l Credit Union Admin. Bd., 104 So. 3d 1208, 1211 (Fla. Dist. Ct. App. 2012) (describing fraud in the inducement as not going "to the very essence of the agreement" but "merely induc[ing] the party to enter the agreement").

underlying material misrepresentation. A fraud in the factum claim will not lie under such circumstances."). As such, this challenge properly belongs to the arbitrator, not the Court, and is thereby not a basis to defeat Ameracat's motion to compel arbitration. See Prima Paint, 388 U.S. at 404-05. By sending Plaintiffs' fraud in the inducement challenge to the arbitrator, the Court in no way passes judgment on the underlying merits of that defense. Cf. Attix v Carrington Mortg. Servs., LLC, 35 F.4th 1284, 1309 (11th Cir. 2022) ("As those keeping score at home will have already realized, here is what we do not decide in this appeal: We do not decide whether Attix's claims have merit.").

### E.  The Arbitration Agreement Delegates the Question of Which Claims are Subject to Arbitration to the Arbitrator

Ameracat requests that the Court compel arbitration of all arbitrable claims against it and stay all claims pending the outcome of arbitration. (Doc. 35 at 1). This of course begs the question of which claims in the Amended Complaint are arbitrable. In addition, Plaintiffs say that their breach of contract claim seeking lost profits for the Vessel's delayed delivery prior to May 22, 2023,[9] is not addressed by the Arbitration Agreement and therefore should proceed to trial "regardless of the outcome of the arbitration issue as to claims relating to the later casualty and physical damage." (Doc. 38 at 7).

Generally, courts decide threshold "arbitrability" issues of whether the parties agreed to arbitrate, such as questions regarding the enforceability, scope, or applicability of the arbitration agreement itself. Attix, 35 F.4th at 1295. However, since the question of who decides arbitrability is itself a question of contract, the FAA permits parties to agree that an arbitrator will decide

---

[9] See Count One of the Amended Complaint, "Breach of Contract for Delayed Delivery of Vessel." (Doc. 26 at 11-12).

these gateway issues in addition to the underlying merits disputes.[10] <u>Henry Schein, Inc. v. Archer and White Sales, Inc.</u>, 586 U.S. 63, 65 (2019). A court may determine that the parties agreed to arbitrate arbitrability "where there is clear and unmistakable evidence that they did so." <u>Martinez v. Carnival Corp.</u>, 744 F.3d 1240, 1246 (11th Cir. 2014) (citing <u>Rent-A-Center</u>, 561 U.S. at 79). "[W]hen parties incorporate the rules of the [American Arbitration Association ("AAA")] into their contract, they clearly and unmistakably agree that the arbitrator should decide whether the arbitration clause applies." <u>U.S. Nutraceuticals, LLC v. Cyanotech Corp.</u>, 769 F.3d 1308, 1311 (11th Cir. 2014) (internal quotations and citation omitted); <u>see also Terminix Intern. Co., LP v. Palmer Ranch Ltd. P'ship</u>, 432 F.3d 1327, 1332 (11th Cir. 2005) ("By incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid."). In fact, the Eleventh Circuit has stated that an arbitration agreement's incorporation of AAA rules into an arbitration agreement clearly and unmistakably evinces an intent to delegate questions of arbitrability even if no other delegation language appears elsewhere in the contract. <u>See JPay, Inc. v. Kobel</u>, 904 F.3d 923, 937 (11th Cir. 2018) ("As we have held, either JPay's incorporation of AAA rules or its express delegation clause would have been enough, on its own, to delegate the question of class availability.").

Here, the Arbitration Agreement provides,

**5. Dispute Resolution.** Any dispute arising under this limited warranty shall be submitted to binding arbitration in accordance with the Florida Arbitration Code, Chapter 44 Florida Statutes, and the rules of the American Arbitration Association then in effect. Venue for any arbitration or legal action shall be Fort Pierce, Florida, and Florida law shall be used for purposes of interpretation and construction of this limited warranty. Where this paragraph is expressly prohibited by state law, it shall be of no effect.

---

[10] These agreements to arbitrate threshold arbitrability issues are often called "delegation" agreements. <u>Rent-A-Center, W., Inc. v. Jackson</u>, 561 U.S. 63, 70 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.").

(Doc. 9-1 at 2). By incorporating the rules of the AAA into the Arbitration Agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause applies. Cyanotech Corp., 769 F.3d at 1311. "The Court's precedents make clear that, when an appeal presents a delegation agreement and a question of arbitrability, we stop. We do not pass go." Attix, 35 F.4th at 1310. As such, the arbitrator must decide to which of Plaintiffs' claims in the Amended Complaint, (Doc. 26), the Arbitration Agreement applies. Accordingly, it is **ORDERED** that Ameracat's Renewed Motion to Compel Arbitration, (Doc. 35), is **GRANTED**.[11] The proceedings between Plaintiffs and Ameracat are hereby **STAYED** pending resolution of these claims in accordance with the Arbitration Agreement. See 9 U.S.C. § 3.

### F. Plaintiffs' Claims Against MAIC Are Stayed Pending Completion of Arbitration Between Plaintiffs and Ameracat

MAIC does not oppose Ameracat's motion to compel arbitration but "believes that if the Court orders arbitration of Plaintiffs' claims against Ameracat, the Court should stay this case as to all claims, including those against MAIC." (Doc. 19 at 1). MAIC issued a marine insurance policy to Minutes of Use and Whisenhunt that insures the Vessel. (Id.; Doc. 26 at 2). Plaintiffs allege that MAIC owes coverage for the Vessel's July 7 casualty per its all-risks hull insurance policy. (Doc. 26 at 7-8). MAIC denied coverage on the insurance claim "because, *inter alia*, the policy excludes coverage for loss or damage caused by or resulting from latent defects or manufacturing defects." (Doc. 19 at 1). The Amended Complaint asserts two claims against MAIC – "Breach of Contract of Insurance by Markel" (Count Six) and "Breach of Duty of Good Faith by Markel in Denying Insurance Coverage" (Count Seven). (Doc. 26 at 14). MAIC moves

---

[11] Plaintiffs raise that the Limited Warranty could be unconscionable under Florida law, thereby rendering it unenforceable. (Doc. 38 at 7 n.3) (citing 9 U.S.C. § 2 and Fla. Stat. § 672.302). However, they submit that the "unconscionability issue is factually and legally complex, and is not before this Court on this Motion to Stay. It would probably be a subject for discovery and trial." (Doc. 38 at 7 n.3). Accordingly, the present Order does not consider the issue.

the Court to render judgment on the pleadings in its favor pursuant to Fed. R. Civ. P. 12(c) as to

Counts Six and Seven. (Docs. 30-31). In addition, MAIC contends that should an arbitrator find

Ameracat liable and if MAIC separately owes Plaintiffs coverage, MAIC would be entitled to a

setoff for any damages Plaintiffs recover from Ameracat. (Doc. 19 at 2). As such, the Court

should stay this case as to all claims pending the outcome of arbitration. (Id. at 1-2).

In some cases, "it may be advisable to stay litigation among the non-arbitrating parties

pending the outcome of the arbitration." Moses H. Cone, 460 U.S. at 20 n.23. This decision is

committed to the district court as a matter of its discretion to control its own docket. Id.;

Advanced Bodycare Sols., LLC v. Thione Int'l, Inc., 524 F.3d 1235, 1241 (11th Cir. 2008)

("[D]istrict courts have inherent, discretionary authority to issue stays in many

circumstances . . . ."); Klay v. All Defendants, 389 F.3d 1191, 1204 (11th Cir. 2004) ("When

confronted with litigants advancing both arbitrable and nonarbitrable claims . . . courts have

discretion to stay nonarbitrable claims."). "[C]ourts generally refuse to stay proceedings of non-

arbitrable claims when it is feasible to proceed with the litigation." Caytrans v. Equip. Rental and

Contractors Corp., No. 08-CV-0691, 2010 WL 2293001, at *1 (S.D. Ala. June 4, 2010) (citing

Klay, 389 F.3d at 1204). However, "[i]f the facts and claims underlying the arbitration and

litigation significantly overlap, a discretionary stay pending arbitration is appropriate, even if the

operative facts are not identical and the claims are not inherently inseparable." Neukranz v.

Conestoga Settlement Servs., LLC, No. 3:19-CV-1681, 2020 WL 4679542, at *4 (N.D. Tex. July

14, 2020) (cleaned up), rep. and recommendation adopted, 2020 WL 4673076 (N.D. Tex. Aug.

12, 2020); see also Brightstar Corp. v. Euler Hermes World Agency S.A.S., No. 1:19-CV-20955,

2020 WL 13880659, at *4 (S.D. Fla. Feb. 20, 2020) (explaining that even when the issues are not

identical, courts have found it appropriate to stay the litigation when questions of fact common to all actions pending in the federal lawsuit are likely to be settled during an arbitration).

In light of the overlapping issues[12] and in exercise of the Court's inherent authority, it is **ORDERED** that the proceedings between Plaintiffs and MAIC are **STAYED** pending the outcome of the arbitration proceedings between Plaintiffs and Ameracat.

**DONE** and **ORDERED** this **26th** day of **April 2024**.

**s / Kristi K. DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[12] Chief among them being the factual dispute over the cause of the Vessel's July 7, 2023, failure.